ESTATE OF HENDRICKSON v. GENESIS HEALTH VENTURE, INC.

[151 N.C. App. 139 (2002)]

THE ESTATE OF DORIS B. HENDRICKSON BY LARRY W. HENDRICKSON, Administrator, LARRY W. HENDRICKSON, LORETTA T. MILLER and ANGELA T. MILLER, Plaintiffs v. GENESIS HEALTH VENTURE, INC., MERIDIAN HEALTH, INC., GENESIS ELDERCARE NETWORK SERVICES, INC., and GENESIS ELDERCARE REHABILITATION SERVICES, INC., Defendants

No. COA01-604

(Filed 2 July 2002)

**1. Wrongful Death— nursing home operator—directed verdict—judgment notwithstanding verdict—sufficiency of evidence**

The trial court did not err by denying defendant nursing home operator's motion for directed verdict and motion for judgment notwithstanding the verdict with respect to the claim of plaintiff administrator for decedent's wrongful death from accidental strangulation when she got caught between the mattress and side rails on her bed at a nursing home, because viewed in the light most favorable to plaintiff administrator, there was evidence tending to show that: (1) nursing assistants employed by defendant were aware that decedent, on several occasions before her death, had slid to the edge of her bed and had become caught between the edge of the mattress and the bed rail; (2) there was a known risk of patients in the same or similar condition as decedent being caught between a bed rail and mattress; (3) no restraint assessment form had been completed for decedent regarding use of the side rails as defendant's restraint policy mandated, and decedent's medical records contained no nursing notes documenting the use of less restrictive measures than the bed rails; and (4) while the evidence was conflicting as to whether the bed rails were used as a restraint or as a safety measure, plaintiff offered evidence that the rails should have been considered a restraint in connection with decedent's care.

**2. Wrongful Death— directed verdict—judgment notwithstanding verdict—sufficiency of evidence**

The trial court erred by denying defendant rehabilitative service's motion for directed verdict and motion for judgment notwithstanding the verdict with respect to the claim of plaintiff administrator for decedent's wrongful death from accidental strangulation when she got caught between the mattress and side rails on her bed at a nursing home because, even viewed in the light most favorable to plaintiffs, the evidence does not disclose

that decedent's death was proximately caused by any breach of a duty owed to her by defendant while a patient at the nursing home.

### 3. Evidence— expert testimony—nursing homes—standard of care—safety measures

The trial court did not abuse its discretion in a wrongful death case by allowing the testimony of an expert witness in the field of registered nursing that defendant nursing home operator's care and treatment did not meet the applicable standard of care and her opinion that defendant's failure to provide an alternative mechanism for decedent's safety increased the risk of decedent's strangling to death, and by allowing an expert with respect to the proper care in nursing to testify that there were other safety measures that could have been used such as bed alarms, because: (1) both witnesses were amply qualified by training, experience, and knowledge to assist the jury in understanding the evidence with respect to nursing procedures and the applicable standard of care required by defendant; and (2) the testimony did not have the potential to confuse or mislead the jury so as to outweigh its probative value.

### 4. Wrongful Death— jury instructions—negligence—standard of care

The trial court did not err in a wrongful death case by giving its jury instructions on three issues including negligence, the standard of care, and defendant nursing home operator's failure to follow its own policies with regard to the use of restraints, because: (1) although defendants contend the trial court erred by failing to submit separate issues as to their alleged negligence, this issue has become moot in view of the Court of Appeals' determination that defendant rehabilitation services should have been granted a directed verdict; (2) with respect to the standard of care required by defendant nursing home operator, there was expert testimony that devices other than those employed by the nursing center should have been used for decedent's safety and testimony that such devices were in use in similarly situated nursing homes in the community is not required where the alleged breach of duty does not involve the provision of medical services requiring special skills; and (3) even though defendant nursing home operator asserts the evidence showed that decedent could not get out of bed by herself and therefore her restraints were for safety and positioning, there was other evidence from which the

jury could find that the side rails on decedent's bed at the nursing home were restraints.

## 5. Wrongful Death— jury instructions—damages recoverable by estate—pain and suffering—loss of society and companionship

The trial court did not err in a wrongful death case by its jury instructions regarding the issue of damages recoverable by decedent's estate for pain and suffering and loss of society and companionship, because: (1) it can be reasonably inferred from the testimony of a doctor that decedent was in pain and that she suffered before her death by strangulation; and (2) evidence of the possibility that decedent could have recovered from her stroke to the point of being able to feed herself and sit in a wheelchair was sufficient to permit recovery for loss of society, companionship, comfort, guidance, kindly offices and advice of decedent to her next of kin.

## 6. Wrongful Death— jury instructions—damages recoverable by estate—loss of net income

The trial court erred in a wrongful death case by its jury instructions regarding the issue of damages recoverable by decedent's estate for loss of decedent's net income, because: (1) no evidence was offered showing that decedent was potentially capable of earning money in excess of that which would be required for her support; and (2) the jury's award as to these damages would necessarily be based on speculation and not supported by the evidence.

## 7. Emotional Distress— negligent infliction—directed verdict—judgment notwithstanding verdict

The trial court erred by denying defendant nursing home operator's motions for directed verdict and judgment notwithstanding the verdict as to plaintiff individuals' claims for negligent infliction of emotional distress arising from decedent's accidental strangulation at a nursing home when decedent got caught between the mattress and side rails on her bed, because: (1) plaintiffs neither witnessed the injuries sustained by decedent nor did they see her in the position in which she was found; (2) plaintiffs presented insufficient evidence to support a finding that defendant's negligent conduct did in fact cause them emotional distress; and (3) plaintiffs failed to present evidence that such distress was severe.

ESTATE OF HENDRICKSON v. GENESIS HEALTH VENTURE, INC.

[151 N.C. App. 139 (2002)]

Appeal by defendants Genesis ElderCare Network Services, Inc., and Genesis ElderCare Rehabilitation Services, Inc., from judgment and order entered 5 January 2000 by Judge Larry G. Ford in Rowan County Superior Court. Heard in the Court of Appeals 21 February 2002.

> *Kluttz, Reamer, Blankenship, Hayes & Randolph, L.L.P.,* by *Roman C. Pibl, for plaintiff-appellees.*

> *Golding, Holden, Pope & Baker, L.L.P.,* by *John G. Golding; and Smith, Helms, Mulliss & Moore, L.L.P.,* by *James G. Middlebrooks, for defendant-appellants.*

MARTIN, Judge.

Plaintiffs filed their complaint in this action asserting claims for negligence, breach of contract, and negligent infliction of emotional distress against Genesis Health Venture, Inc., Meridian Health, Inc., Genesis ElderCare Network Services, Inc., Genesis ElderCare Rehabilitation Services, Inc., and Meridian Healthcare, Inc. The claims arise out of the death of Doris Hendrickson on 30 October 1996 while she was a resident at the Salisbury Center, a nursing home facility in Rowan County. Plaintiffs sought actual and punitive damages. Defendants filed an answer in which they denied the material allegations of the complaint. Prior to trial, the trial court granted defendants' motion for a bifurcated trial and ordered that the issues with respect to defendants' liability, if any, for compensatory damages be tried separately from the issue of defendants' liability, if any, for punitive damages.

The evidence at trial tended to show that Doris Hendrickson suffered a massive stroke while she was a patient at Rowan Regional Medical Center in the summer of 1996. The stroke left her totally dependent on others for her daily care. After Mrs. Hendrickson was discharged from the hospital, she was admitted to Salisbury Center, a nursing home, which was operated by defendant Genesis ElderCare Network Services, Inc. Mrs. Hendrickson remained in the nursing home from 8 August 1996 to 11 August 1996, when she was hospitalized again, and she returned to the nursing home on 30 August 1996 and remained there until her death on 30 October 1996.

While Mrs. Hendrickson was a patient in the Salisbury Center, her husband, Larry Hendrickson, and her two daughters, Angela and Loretta Miller each visited her daily. Dr. Yuthapong Sukkasem was

ESTATE OF HENDRICKSON v. GENESIS HEALTH VENTURE, INC.

[151 N.C. App. 139 (2002)]

Mrs. Hendrickson's treating physician while she was at the Salisbury Center. Dr. Sukkasem ordered that Mrs. Hendrickson's bed be equipped with "side rails times two for positioning and safety." He testified that he did not consider the side rails on Mrs. Hendrickson's bed to be restraints, explaining that side rails are restraints if they inhibit a patient from doing what the patient wants to do. Since Mrs. Hendrickson could not get out of bed by herself, the side rails were not obstructing her and therefore, he did not consider them to be restraints.

During their numerous visits, none of the plaintiffs noticed any hazardous or unsafe condition with respect to the side rails on Mrs. Hendrickson's bed, nor were there any indications that she could move herself sufficiently to injure herself in connection with them. In fact, both Mr. Hendrickson and Loretta Miller testified that when they found a side rail down on Mrs. Hendrickson's bed, they would either pull the rail up or advise the staff and have them pull the rail up. When Loretta Miller was asked if the side rails on her mother's bed were restraints, she stated "I feel like she needed that. I didn't want her to fall out of bed." She indicated that the side rails were for her mother's safety.

The evidence conflicted with respect to Mrs. Hendrickson's ability to move on her bed while in the nursing home. Mrs. Hendrickson's stroke left her paralyzed on the right side so she was unable to move her right arm and leg. Angela Miller testified that occasionally her mother would hold onto the nearest side rail with her left hand. Angela Miller saw her mother "wiggle" some and move her left leg and arm some but never saw her move from side to side on the bed. Mr. Hendrickson and Loretta Miller agreed with Angela that while in their presence, Mrs. Hendrickson never moved on her own to any significant degree. However, other evidence showed that Mrs. Hendrickson often slid to the left side of the bed, and would get caught between the side rail and the bed, so that the nursing assistants would have to reposition her. According to Dr. Sukkasem, Mrs. Hendrickson could move her left hand and left leg. He testified that Mrs. Hendrickson could hold on to something with her left hand and pull herself toward a side of the bed, and he presumed that Mrs. Hendrickson could slide some in her bed since he saw her in different positions when he examined her. However, Dr. Sukkasem testified that he had never actually seen Mrs. Hendrickson move around in her bed.

While at the Salisbury Center, Mrs. Hendrickson never progressed to the point of being able to talk but she was able to make whispering

sounds. Because she was unable to swallow, she had to be fed by a feeding tube. Additionally, the entire time Mrs. Hendrickson was in the nursing home, she remained incontinent of bowel and bladder. When questioned about the prospects for Mrs. Hendrickson's improvement considering her age and medical problems, Dr. Sukkasem stated that had she lived, she could have possibly been able to feed herself and sit in a wheelchair, but would be incontinent of her bladder, still unable to move on one side, and would require total care for everything else.

Due to their dissatisfaction with the quality of care Mrs. Hendrickson was receiving at the Salisbury Center, her husband and daughter had planned to remove her from the nursing home to their home on 2 November 1996, and to provide care for her themselves. On the evening of 29 October 1996, Mr. Hendrickson visited his wife and stayed with her until she went to sleep. When he left, Mrs. Hendrickson was in the middle of the bed, with pillows on each side of her. Mr. Hendrickson testified that he thought his wife was in a safe position. At 12:00 or 12:15 a.m. on 30 October 1996, Ginger Ferguson, a CNA, was in Mrs. Hendrickson's room, trying to calm her roommate down. Ms. Ferguson observed that Mrs. Hendrickson was resting on her left side with her eyes closed and with pillows propped up against her back to help support her at a 35 to 40 degree angle with her head raised so that she would not aspirate fluids with the feeding tube in her stomach. Ms. Ferguson further testified that Mrs. Hendrickson's mattress appeared to be evenly spaced and normal.

Between 1:00 and 1:15 a.m., Ms. Ferguson went into Mrs. Hendrickson's room again while making rounds and found that although Mrs. Hendrickson's body was still on the mattress, her head was wedged between the mattress and the adjacent bed rail. Ms. Ferguson observed that the mattress was pushed up against the bed rail on the opposite side of the bed. Ms. Ferguson immediately called for assistance, and Mrs. Hendrickson was removed from the position in which she had been found. Mrs. Hendrickson had no vital signs. CPR was not initiated because Mr. Hendrickson and two physicians had signed a "Do Not Resuscitate" form.

Mrs. Hendrickson's family was notified of the death and went to the nursing home. When Angela Miller saw her mother, "she was cleaned up. She had on a gown. She was positioned up in the bed. She was like she was asleep . . . ." Angela also noticed a substance that she thought was saliva on the floor directly below where her mother's

**ESTATE OF HENDRICKSON v. GENESIS HEALTH VENTURE, INC.**

[151 N.C. App. 139 (2002)]

head had been. There was a large bruise on Mrs. Hendrickson's neck. Since the family had questions concerning the manner in which Mrs. Hendrickson had died, Dr. Sukkasem attempted to re-create what he thought had occurred by actually getting in the bed and placing his left arm and head in the gap between the mattress and the bed rail. After conversing with Dr. Sukkasem, the family decided not to have an autopsy performed on Mrs. Hendrickson's body. The police report indicated that Mrs. Hendrickson died of accidental strangulation.

At trial, a portion of "Genesis ElderCare Centers' Administration Manual" was admitted for purposes of showing the nursing home's policy regarding restraints. According to the nursing home's policy,

> Genesis ElderCare residents have the right to be free from any physical or chemical restraint. Under no circumstances will restraints be applied to control resident behavior for the convenience of the staff.

> Physical Restraints will be considered any manual method or physical or mechanical device, material or equipment attached or adjacent to the resident's body that:

> 1. The individual cannot remove easily; and

> 2. Restricts freedom of movements or normal access to one's body

In the policy, side rails were listed as an example of physical restraints. The policy described the following process required in using restraints on patients:

1. A physician order is required for a restraint.

2. All residents who require the use of restraints will be assessed using the Restraint Assessment Form then referred to the Restraint Alternative Team/Committee.

3. In all cases, less restrictive measures such as pillows, self-releasing belts, pads, removable lap trays, behavioral management and appropriate exercises will be utilized before any restraining device.

4. Nursing will document the effectiveness of less restrictive measures. If the resident still appears to require a restrictive device, consultation with an appropriate professional, such as Occupational or Physical Therapist may be obtained.

5. A physical order is required for a restraint. No routine or standing orders for restraints or "protective devices" will be accepted on admission, re-admission, or during the stay.

Vivian Brown, who was qualified as an expert witness in the proper care in nursing homes, testified that the Salisbury Center had failed to follow Genesis' process for using the side rails as restraints on Mrs. Hendrickson's bed. Ms. Brown testified that she found no Restraint Assessment Form regarding the side rails used for Mrs. Hendrickson nor did she find any nurses' notes documenting the effectiveness of less restrictive measures. Ms. Brown testified that the nursing home's failure to fill out a restraint evaluation for the side rails violated the applicable standard of care. Ms. Brown also testified that there were other measures that could have been used to ensure Mrs. Hendrickson's safety such as padded side rails, half side rails, and bed alarms.

At the close of plaintiffs' evidence, directed verdicts were granted in favor of all defendants except Genesis ElderCare Network Services, Inc., and Genesis ElderCare Rehabilitation Service, Inc.; motions for directed verdicts by those defendants at the close of plaintiffs' evidence and at the close of all the evidence were denied. A jury found that Mrs. Hendrickson's death was caused by the negligence of defendants Genesis ElderCare Network Services, Inc., ("GENS") and Genesis ElderCare Rehabilitation Service, Inc., ("GERS") and awarded damages to her estate in the amount of $125,000. In addition, the jury found that Larry Hendrickson, Loretta Miller, and Angela Miller had each suffered severe emotional distress as a proximate result of defendants' negligence. The jury awarded Larry Hendrickson damages for emotional distress in the amount of $900,000 and awarded Loretta Miller and Angela Miller damages for emotional distress in the amount of $225,000 each. The trial court granted defendants' motion to dismiss plaintiffs' claims for punitive damages, but denied both defendants' motions for judgment notwithstanding the verdict. Both defendants appeal from the judgment entered upon the verdict.

I.

By their first argument, each defendant contends the trial court erred by denying its motion for directed verdict and motion for judgment notwithstanding the verdict with respect to the claim of plaintiff administrator for Mrs. Hendrickson's wrongful death. Both

defendants contend the evidence was insufficient to show that her death was proximately caused by their negligence.

In order to establish a claim for negligence, a plaintiff must introduce evidence tending to establish that,

> (1) defendant failed to exercise proper care in the performance of a duty owed to plaintiff; (2) the negligent breach of that duty was a proximate cause of plaintiff's injury; and (3) a person of ordinary prudence should have foreseen that plaintiff's injury was probable under the circumstances as they existed.

*Rose v. Steen Cleaning, Inc.*, 104 N.C. App. 539, 541, 410 S.E.2d 221, 222 (1991).

A defendant's motion for directed verdict made pursuant to G.S. § 1A-1, Rule 50(a) tests the legal sufficiency of the evidence to support a verdict for the plaintiff. *Whaley v. White Consolidated Industries, Inc.*, 144 N.C. App. 88, 92, 548 S.E.2d 177 180, *disc. review denied*, 354 N.C. 229, 555 S.E.2d 277 (2001) (citing *Manganello v. Permastone, Inc.*, 291 N.C. 666, 231 S.E.2d 678 (1977)). A motion for judgment notwithstanding the verdict pursuant to G.S. § 1A-1, Rule 50(b) is a renewal of an earlier motion for directed verdict. *Id.*, (citing *Bryant v. Nationwide Mut. Ins. Co.*, 313 N.C. 362, 329 S.E.2d 333 (1985)). Therefore, the standard of review for both motions is the same, and the question presented is whether the evidence was sufficient to go to the jury. *Id.* All conflicts in the evidence must be resolved in favor of the plaintiff and the plaintiff must be given the benefit of all reasonable inferences that may be drawn from the evidence, and the motion should be allowed only where the evidence is legally insufficient to sustain a verdict in favor of the plaintiff. *Id.* It has been said that the motion should be denied if there is more than a scintilla of evidence supporting each element of the plaintiff's case. *Little v. Matthewson*, 114 N.C. App. 562, 442 S.E.2d 567 (1994), *affirmed*, 340 N.C. 102, 455 S.E.2d 160 (1995). "Issues arising in negligence cases are ordinarily not susceptible of summary adjudication because application of the prudent man test, or any other applicable standard of care, is generally for the jury." *Taylor v. Walker*, 320 N.C. 729, 734, 360 S.E.2d 796, 799 (1987).

A.

## Genesis ElderCare Network Services, Inc.

[1] Defendant Genesis ElderCare Network Services, Inc., ("GENS") argues the evidence was deficient in several respects as to any negli-

gence on its part or that the incident which led to Mrs. Hendrickson's death was reasonably foreseeable. First, GENS contends plaintiff administrator failed to show that it knew or should have known of the risk of injury to Mrs. Hendrickson from the side rails. We disagree. Viewed in the light most favorable to plaintiff administrator, there was evidence tending to show that nursing assistants employed by GENS were aware that Mrs. Hendrickson, on several occasions before her death on 30 October 1996, had slid to the edge of the bed and had become caught between the edge of the mattress and the bed rail. In addition, plaintiffs offered evidence through the testimony of their expert witness, Vivian Brown, as to the known risk of patients in the same or similar condition as Mrs. Hendrickson being caught between a bed rail and mattress.

Plaintiffs also offered evidence tending to show that GENS had in effect, at the time of Mrs. Hendrickson's stay at the Salisbury Center, a restraint policy which mandated an assessment, utilizing a "Restraint Assessment Form," of any resident for whom the use of restraints was required, and the nursing staff was required to document the effectiveness of less restrictive measures. The assessment was required to be reviewed by a "Restraint Alternative Team/Committee." Plaintiffs offered evidence that no Restraint Assessment Form had been completed for Mrs. Hendrickson and her medical records contained no nursing notes documenting the use of less restrictive measures than the bed rails. Defendant argues, however, the bed rails were required for positioning and safety and were not restraints, so that no restraint assessment was required. While the evidence was conflicting as to whether the bed rails were used as a restraint or as a safety measure, plaintiffs offered evidence that the rails should have been considered a restraint in connection with Mrs. Hendrickson's care. As noted above, the trial court is required to resolve such conflicts in the plaintiff's favor when ruling on a defense motion for directed verdict. Taken in the light most favorable to plaintiffs, there was sufficient evidence to show that GENS violated its own policies and the applicable standard of care in failing to undertake a restraint assessment for the side rails.

For the foregoing reasons, we conclude that plaintiffs offered sufficient evidence to sustain a finding by the jury that defendant GENS was negligent in failing to conform to applicable standards of care and its own policies with respect to the use of physical restraints and that such negligence was a proximate cause of Mrs. Hendrickson's death. The motions by defendant GENS for directed verdict and judgment notwithstanding the verdict were properly denied.B.

Genesis ElderCare Rehabilitation Services, Inc.

[2] We reach a different result, however, with respect to defendant Genesis ElderCare Rehabilitation Services, Inc., ("GERS"). The evidence in this case, even viewed in the light most favorable to plaintiffs, does not disclose that Mrs. Hendrickson's death was proximately caused by any breach of a duty owed her by GERS, while a patient at the Salisbury Center. Therefore, the trial court erred in denying the motion for directed verdict by defendant GERS and the judgment entered in favor of the Estate of Doris Hendrickson against that defendant is reversed.

## II.

[3] By a single assignment of error, defendant GENS next argues that the trial court erred in three evidentiary rulings by: (1) allowing Angela Miller's testimony that defendant's care and treatment did not meet the applicable standard of care; (2) allowing Angela Miller's opinion that after Mrs. Hendrickson had demonstrated that she would not use a regular call bell or a paddle type device which had been provided, "there should have been something else provided . . ." and that defendant's failure to provide another mechanism for her safety increased the risk of Mrs. Hendrickson strangling to death; and (3) allowing expert Vivian Brown's testimony that there were other safety measures that could have been used such as bed alarms. Defendant GENS argues that such testimony was prejudicial to it in the jury's consideration of proximate cause and entitles it to a new trial. We are unpersuaded.

Angela Miller was accepted by the trial court as an expert witness in the field of registered nursing and Vivian Brown was accepted by the trial court as an expert witness with respect to the proper care in a nursing home. The testimony of expert witnesses is governed by G.S. § 8C-1, Rule 702, which provides as follows:

> (a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

In applying Rule 702, the trial court is afforded wide discretion and will be reversed only for an abuse of that discretion. *State v. Evangelista*, 319 N.C. 152, 353 S.E.2d 375 (1987). Further, under Rule 403 even relevant evidence may properly be excluded by the trial

court if its probative value is outweighed by the danger that it would confuse the issues or mislead the jury. *State v. Mason*, 315 N.C. 724, 340 S.E.2d 430 (1986). Whether to exclude expert testimony for this reason also rests within the sound discretion of the trial court. *Id.*

Having reviewed the testimony of both witnesses, we discern no abuse of discretion in the rulings complained of by defendant GENS. Both witnesses were amply qualified by training, experience and knowledge to assist the jury in understanding the evidence with respect to nursing procedures and the applicable standard of care required of GENS. Nor do we believe the testimony had such potential to confuse or mislead the jury so as to outweigh its probative value. This assignment of error is overruled.

### III.

[4] By three assignments of error joined in a single argument, defendant GENS contends the court erred in its instructions to the jury (1) by failing to submit separate issues as to the alleged negligence of GENS and GERS, (2) by giving contentions not supported by admissible evidence, and (3) by giving instructions not supported by any evidence. We reject these contentions.

With respect to the first contention, GENS and GERS argue, in their joint brief, that the failure of the trial court to submit separate issues as to the negligence of each defendant was prejudicial to GERS, since there was no evidence that any conduct on the part of GERS had proximately caused Mrs. Hendrickson's death. In view of our determination that GERS should have been granted a directed verdict and our reversal of the judgment against that defendant, the assignment of error has become moot and we need not consider the issue.

Defendant GENS argues that the trial court erred by instructing the jury that the failure of GENS to provide other safety or emergency call devices when it knew Mrs. Hendrickson could not, or would not, use the emergency call bell could be negligence. GENS argues there was no evidence that alternative devices such as those described by Angela Miller or Vivian Brown were in general use in facilities similar to the Salisbury Center in October of 1996 or that such devices "would probably have gone off under the circumstances in which Mrs. Hendrickson was found."

This Court is required to consider and review jury instructions in their entirety. *Robinson v. Seaboard System R.R., Inc.*, 87 N.C. App.

512, 361 S.E.2d 909 (1987), *disc. review denied,* 321 N.C. 474, 364 S.E.2d 924 (1988). Under the applicable standard of review, the appealing party must show not only that error occurred in the jury instructions but also that such error was likely, in light of the entire charge, to mislead the jury. *Id.*

Bearing these principles in mind, we find no error in the trial court's instructions to the jury with respect to the standard of care required of GENS. There was expert testimony that devices other than those employed by the Salisbury Center should have been used for Mrs. Hendrickson's safety. Testimony that such devices were in use in similarly situated nursing homes in the community is not required where the alleged breach of duty does not involve the provision of medical services requiring special skills; in such cases, the standard of care of the reasonable, prudent person is the standard courts have generally applied. *Burns v. Forsyth County Hosp. Authority, Inc.,* 81 N.C. App. 556, 344 S.E.2d 839 (1986); *Norris v. Rowan Memorial Hospital, Inc.,* 21 N.C. App. 623, 205 S.E.2d 345 (1974).

GENS also asserts there was no evidence to support the court's instruction that it could be found liable for the failure of GENS to follow its own policies with regard to the use of restraints, because the evidence showed that Mrs. Hendrickson could not get out of bed by herself and the bed rails were, therefore, for safety and positioning rather than restraint. As noted previously, however, there was other evidence from which the jury could find that the side rails were restraints. These assignments of error are overruled.

IV.

[5] GENS next contends the trial court erred in its jury instructions with respect to the issue of damages recoverable by Mrs. Hendrickson's estate for her wrongful death. Defendants specifically argue that the court improperly instructed the jury that it was required to consider the pain and suffering of decedent after injury and before death; net income of the deceased; and society, companionship, comfort, guidance, kindly offices and advice of the deceased to her next of kin. Defendants claim that there was no evidence supporting these factors and therefore, the jury should not have been instructed to consider them.

When charging a jury in a civil case, "the trial court has the duty to explain the law and apply it to the evidence on the substantial

issues of the action." *Wooten v. Warren*, 117 N.C. App. 350, 358, 451 S.E.2d 342, 347 (1994). The trial court is permitted to instruct a jury on a claim or defense only "if the evidence, when viewed in the light most favorable to the proponent, supports a reasonable inference of such claim or defense." *Id.* Thus, "[t]o instruct on an element of damages, absent evidence thereof, is error." *Goble v. Helms*, 64 N.C. App. 439, 447, 307 S.E.2d 807, 813 (1983), *disc. review denied*, 310 N.C. 625, 315 S.E.2d 690 (1984). Damages in a wrongful death action, "must be proved to a reasonable level of certainty, and may not be based on pure conjecture." *DiDonato v. Wortman*, 320 N.C. 423, 431, 358 S.E.2d 489, 493 (1987). We are mindful that by necessity, some speculation is necessary in determining damages under our wrongful death statute. *Beck v. Carolina Power and Light Co.*, 57 N.C. App. 373, 291 S.E.2d 897, *affirmed*, 307 N.C. 267, 297 S.E.2d 397 (1982). However, a damage award may not be based on sheer speculation. *Id.*

Defendant GENS argues that the trial court erred in charging the jury on pain and suffering since there was no evidence that Mrs. Hendrickson was conscious between the time her head became lodged between the bed rail and the edge of the mattress, and her death. We conclude, however, that it can be reasonably inferred from the testimony of Dr. Sukkasem that Mrs. Hendrickson was in pain and suffered before her death by strangulation. The trial court did not err in instructing the jury that plaintiffs could recover damages for decedent's pain and suffering.

GENS also argues that the jury should not have been permitted to consider the loss of society, companionship, comfort, guidance, kindly offices and advice of the deceased to her next of kin in awarding damages to plaintiffs. We disagree. Though the evidence tended to show that, as a result of her stroke, Mrs. Hendrickson was totally disabled and was unable to communicate verbally prior to her death, Dr. Sukkasem testified as to the possibility that she could have recovered to the point of being able to feed herself and sit in a wheelchair. We conclude this evidence was sufficient to permit recovery for the loss of Mrs. Hendrickson's society, companionship, comfort, guidance, kindly offices and advice of the deceased to her next of kin.

[6] Finally, GENS argues that the jury should not have been allowed to award damages for the loss of Mrs. Hendrickson's net income because there was no evidence that she had income in excess of living expenses. This argument has merit.

Dr. Ward Brian Zimmerman, who was permitted to testify as "an expert in economic loss and wrongful death cases," testified that based on Mrs. Hendrickson's Social Security benefits that she received from 1992 to 1996 and assuming a life expectancy of 84 years, income loss to Mrs. Hendrickson's estate was $80,131. Dr. Zimmerman acknowledged, however, that he had not estimated Mrs. Hendrickson's medical, food, or clothing expenses.

In order to recover damages for loss of net income of the decedent, a plaintiff must offer evidence demonstrating that the decedent "was potentially capable of earning money in excess of that which would be required for her support." *Greene v. Nichols*, 274 N.C. 18, 29, 161 S.E.2d 521, 528 (1968). Though *Greene* was decided under former G.S. § 28-174, before our wrongful death statute was amended in 1969, *see DiDonato*, 320 N.C. at 429, 358 S.E.2d at 492, our current wrongful death statute also requires proof of income in excess of expenses in order to recover damages for the loss of the net income of a decedent. N.C. Gen. Stat. § 28A-18-2(b)(4) (compensation for loss of reasonably expected net income). In the instant case, no evidence was offered showing that the decedent was potentially capable of earning money in excess of that which would be required for her support. Therefore, the jury's award as to these damages would necessarily be based on speculation and not supported by evidence. Consequently, the trial court erred in instructing the jury that it could award damages for loss of Mrs. Hendrickson's net income. The error requires that we award defendant a new trial as to the issue of damages for Mrs. Hendrickson's wrongful death.

## V.

[7] Defendant GENS next assigns error to the trial court's denial of its motion for directed verdict and judgment notwithstanding the verdict as to the claims of the individual plaintiffs, Larry Hendrickson, Angela Miller, and Loretta Miller, for negligent infliction of emotional distress.

The elements of a claim for negligent infliction of emotional distress are:

(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress . . ., and (3) the conduct did in fact cause the plaintiff severe emotional distress.

*Johnson v. Ruark Obstetrics and Gynecology Associates, P.A.*, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990). GENS contends the evidence was insufficient to support a verdict that it was reasonably foreseeable that defendant's conduct would cause plaintiffs severe emotional distress or that plaintiffs did, in fact, suffer severe emotional distress.

Factors to be considered in determining whether it was reasonably foreseeable that a defendant's conduct would cause a plaintiff severe emotional distress include:

> the plaintiff's proximity to the negligent act, the relationship between the plaintiff and the other person for whose welfare that plaintiff is concerned, and whether the plaintiff personally observed the negligent act.

*Id.* at 305, 395 S.E.2d at 98. In the instant case, plaintiffs were not present at the time of Mrs. Hendrickson's death. Mr. Hendrickson had been the last of plaintiffs to visit Mrs. Hendrickson before her death. He stayed with Mrs. Hendrickson on the evening of 29 October 1996 until she had fallen asleep. When Mr. Hendrickson left, his wife was in the middle of the bed, with pillows on both sides of her and was in what Mr. Hendrickson believed to be a safe position.

Before any of the family members arrived at the nursing home after Mrs. Hendrickson's death, Mrs. Hendrickson had been removed from the position in which she had been found, and she was in the middle of the bed. Angela Miller testified that when she saw her mother, "she was cleaned up. She had on a gown. She was positioned up in the bed. She was like she was asleep. . . ." The family noticed a large bruise on Mrs. Hendrickson's neck and Angela Miller observed a substance on the floor directly below where her mother's head had been that she presumed was saliva. Since plaintiffs were not present to observe the alleged negligent conduct which caused Mrs. Hendrickson's death and did not observe her being injured or in an injured condition, their evidence was insufficient to support the necessary element that it was reasonably foreseeable that defendant's negligent conduct would cause plaintiffs severe emotional distress.

Several cases support our conclusion. In *Hickman v. McKoin,* 337 N.C. 460, 446 S.E.2d 80 (1994), our Supreme Court held that the trial court properly granted the defendant's motion to dismiss the plaintiffs' claim for negligent infliction of emotional distress. The

plaintiffs claimed that they suffered from severe emotional distress caused by their mother's injury resulting from an automobile accident involving the defendant. The plaintiffs were at home at the time of the accident but saw their mother briefly in the intensive care unit. The plaintiffs also witnessed their mother in pain and observed her undergo operations and treatment for several years after the accident. The Court concluded that the plaintiffs were unable to establish the necessary element of reasonable foreseeability.

Similarly, in *Gardner v. Gardner*, 334 N.C. 662, 435 S.E.2d 324 (1993), our Supreme Court held that the trial court properly granted summary judgment in favor of defendant upon the plaintiff's claim for negligent infliction of emotional distress. In *Gardner*, it was stipulated that the plaintiff mother "suffered severe emotional distress upon seeing her son in the emergency room undergoing resuscitative efforts a period of time after the [automobile] accident, and upon learning subsequently of his death." *Id.* at 667, 435 S.E.2d at 328. The plaintiff was several miles away at the time of the accident and was informed of the accident by telephone. The Court concluded that the parent-child relationship was not sufficient to compensate for the plaintiff's lack of close proximity to the negligent act and lack of observation of the negligent act. Therefore, the Court held that the plaintiff failed to establish the element of reasonable foreseeability.

Conversely, in *Fox-Kirk v. Hannon*, 142 N.C. App. 267, 542 S.E.2d 346, *disc. review denied*, 353 N.C. 725, 551 S.E.2d 437 (2001), where this Court affirmed the trial court's denial of the defendant's motion for directed verdict, the plaintiff mother was present in the car, personally observed the defendant's negligent act, and immediately perceived the injuries suffered by her daughter. In the present case, as in *Hickman* and *Gardner*, but unlike *Fox-Kirk*, plaintiffs neither witnessed the injuries sustained by Mrs. Hendrickson nor did they see her in the position in which she was found.

We also conclude that plaintiffs presented insufficient evidence to support a finding that defendant's negligent conduct did in fact cause them severe emotional distress. Our Supreme Court has defined "severe emotional distress" as

> any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.

*Johnson*, 327 N.C. at 304, 395 S.E.2d at 97. "[M]ere temporary fright, disappointment or regret will not suffice" to satisfy the element of severe emotional distress. *Id.*

The evidence at trial tended to show that after Mrs. Hendrickson's death, plaintiff Angela Miller had trouble sleeping and eating and had nightmares. Angela Miller saw a counselor at Tri-County Mental Health and told her that she was feeling a lot of guilt for not having taken her mother home and taken care of her. She scheduled another tentative appointment with the counselor for January 1997 but missed that appointment because her son was in the hospital after having a seizure. She testified that she saw a total of three counselors. She continued in her employment after her mother's death and there was no evidence that she took time off from work due to emotional problems.

Loretta Miller testified that when she found out what had happened to her mother she was "emotionally distraught" and "in shock." Loretta Miller took a week off from work after her mother's death. In November or December of 1996, she went to a doctor and was prescribed an antidepressant and she saw a psychiatrist for several months. She was hospitalized for emotional problems on two occasions subsequent to her mother's death. The first hospitalization occurred approximately a week after she had broken up with the man with whom she had been living; she was admitted on a Sunday and released the following Monday. She was again admitted to the hospital the following week and stayed approximately eight days. No healthcare provider offered testimony to show a causal relationship between the effect of her mother's death and Loretta Miller's treatment or to show that her emotional distress was not caused by problems preceding the death or stresses after the death. Indeed, there was evidence showing that Loretta Miller had seen a physician for nervousness, upset stomach and digestive problems due to nerves prior to her mother's stroke.

Mr. Hendrickson testified that when he arrived at the nursing home after his wife's death, he was met at the front of the facility by Connie Morgan, who as Mr. Hendrickson stated, "wanted to warn me that Doris was going to have a bruise across her neck and that she, you know, kind of prepared me . . . ." Mr. Hendrickson stated that after his wife's death, he saw a counselor provided by his employer on at least two occasions and that he went once or twice to Tri-Mental Health. His first appointment with a counselor was 3 December 1996. Mr. Hendrickson was out of work for approximately two weeks after

**ESTATE OF HENDRICKSON v. GENESIS HEALTH VENTURE, INC.**

[151 N.C. App. 139 (2002)]

his wife's death. The evidence also showed that Mr. Hendrickson went to a physician prior to his wife's death and was given a prescription for an anti-depressant medication. Between her death in 1996 and the time of trial, in October 1999, he had the prescription filled only twice and still had some pills left at the time of trial. Mr. Hendrickson returned to the same physician, Dr. McNeil, the month following his wife's death and was given a gastro-intestinal examination and received a referral for a CT scan on his lungs.

We hold that this evidence is insufficient to show severe emotional distress. Although there was evidence that plaintiffs were emotionally distressed due to Mrs. Hendrickson's death, plaintiffs failed to present evidence, even viewed in the light most favorable to them, that such distress was severe. The trial court erred in denying defendant GENS' motion for directed verdict as to plaintiffs' claims for the negligent infliction of emotional distress.

In summary, as to defendant Genesis Eldercare Rehabilitation Services, Inc., the judgment is reversed. As to defendant Genesis Eldercare Network Services, Inc., we find no error with respect to the jury's verdict finding that Doris Hendrickson's death was caused by the negligence of that defendant. For the reason stated in Part IV of this opinion, however, we award defendant Genesis ElderCare Network Services, Inc., a new trial on the issue of damages to which the Estate of Doris Hendrickson is entitled for her wrongful death. The judgment awarding damages to Larry W. Hendrickson, Loretta T. Miller, and Angela T. Miller for negligent infliction of emotional distress is reversed.

No error in part, reversed in part, remanded in part for a new trial.

Judges HUDSON and CAMPBELL concur.