700 S.E.2d 50 (2010)
In the Matter of the WILL OF Leyla K. BAITSCHORA, Deceased.
State of North Carolina, Durham County, Martin Totorgul, Plaintiff,
v.
Ismail Abayhan, individually and as Executor of the Estate of Leyla K. Baitschora, Zubayda Renate Abayhan, Ursula S. Abayhan, Chase Investment Services Corp., and Genworth Life and Annuity Insurance Company, Defendants.
No. COA09-1141.
Court of Appeals of North Carolina.
September 21, 2010.
*52 McPherson, Rocamora & Nicholson, P.L.L.C., by William V. McPherson, Jr., Durham, for propounder-appellant.
Glenn, Mills, Fisher & Mahoney, P.A., by Carlos E. Mahoney, Durham, for caveator-appellee.
HUNTER, JR., ROBERT N., Judge.
This appeal concerns a caveat proceeding regarding the purported will of Leyla K. Baitschora ("decedent"). Ismail Abayhan ("propounder"),[1] decedent's nephew, appeals a judgment and order from the trial court. The judgment set aside decedent's purported will after a jury determined that it was procured by undue influence. The order taxed decedent's estate with Martin Totorgul's ("caveator's") attorneys' fees and costs.
Propounder argues on appeal that the trial court erred by: (1) excluding oral communications between decedent and propounder; (2) charging the jury that a fiduciary relationship existed between propounder and decedent; and (3) awarding caveator attorneys' fees and costs after notice of appeal was entered from the judgment. After review, we find no prejudicial error.

I. BACKGROUND
At trial, the evidence tended to show the following. In early May 2007, decedent was seventy-six years old and living in a New York apartment with her son, caveator. Caveator had been taking care of decedent for over a year, during which time decedent underwent her second round of chemotherapy treatment for terminal uterine cancer. During the treatment, she had large amounts of fluid regularly drained from her abdomen.
Ms. Gregory, a neighbor, testified that decedent and caveator had a close relationship prior to May 2007. Decedent told Ms. Gregory that she wanted to leave all of her assets to caveator and had signed a paper writing to that effect in front of Ms. Gregory. At the time this first writing was executed, caveator was the beneficiary of decedent's brokerage accounts and an annuity. Caveator also served as decedent's health care agent.
On the evening of 13 May 2007, a dispute arose between decedent and caveator. Caveator testified that the dispute concerned the refusal of his mother to eat some food that he had prepared. Propounder attempted to offer rebuttal testimony that the dispute escalated and frightened decedent when caveator cursed at decedent, broke some dishes, and kicked furniture; however, this proffered testimony was excluded by the trial court.
After this argument occurred and while the caveator was shopping later that same evening, decedent went to a neighbor's apartment and asked if she could spend the night. The next morning, decedent demanded that caveator leave and return the keys to her apartment, which he did. After caveator left, decedent went to Chase Bank, met with her financial advisor, Jorge Torres, and executed new beneficiary designations for two brokerage accounts. Decedent changed the beneficiary designations from caveator alone to propounder and his two sisters, Ursula and *53 Zubayda Renate Abayhan, in equal shares. To obtain contact and identifying information for this change, Mr. Torres called Ursula Abayhan. Ursula subsequently called propounder and told him that decedent was changing the beneficiaries on her accounts. Decedent also changed the beneficiary designations on an annuity she had with Genworth Life to allow propounder, Ursula, and Zubayda to be the beneficiaries in equal shares.[2]
A short time after changing these beneficiary designations, decedent was taken to Cabrini Medical Center and hospitalized until 17 May 2007. The next day, propounder, at decedent's request, arrived at decedent's apartment. Propounder was surprised by decedent's poor health, and proceeded to stay in decedent's apartment from 18 to 22 May 2007. On 23 May 2007, propounder packed decedent's possessions and moved her from New York to his home in Durham, North Carolina.
On 24 May 2007, one day after bringing decedent to Durham, propounder called Mr. Torres about transferring decedent's accounts from Chase Bank to Wachovia Bank in Durham. Mr. Torres later testified in his deposition that propounder "said he had a relationship with a financial advisor at Wachovia and he was looking to transfer the investment account to that person." Later the same day, propounder took decedent to Roseanne Wallace, propounder's personal banker at Wachovia. Ms. Wallace described decedent at the meeting as being "frail and weak." While at the bank, decedent opened two Wachovia accounts so that she could transfer her money from New York. Ms. Wallace suggested at the meeting that decedent have a will executed in North Carolina. Sometime during this same day, propounder prepared a withdrawal request form for the annuity at Genworth Life and attempted to collect money owed to decedent by one of decedent's friends.
On 25 May 2007, propounder brought decedent back to Wachovia, and decedent opened an individual retirement account ("IRA"). Decedent funded the Wachovia IRA with cash from an IRA she had at Fidelity Bank. Propounder and his two sisters were named the beneficiaries, in equal shares, of the newly established Wachovia IRA. At the meeting with Ms. Wallace, propounder claimed to have decedent's power of attorney, though no document had been executed by decedent.
On 31 May 2007, decedent was admitted to Duke Medical Center after suffering shortness of breath, prolonged constipation, dehydration, abdominal pain, and lack of appetite. Decedent stayed in the hospital until 7 June 2007.
On 4 June 2007, propounder asked Ms. Wallace to find an attorney to draft a will. Ms. Wallace later testified that "they needed to go ahead and get the will completed." One of Ms. Wallace's colleagues at Wachovia contacted Attorney Gwendolyn Brooks' office and said that they were "sending a client . . . who needs a will for his aunt ASAP." Propounder called Attorney Brooks the same day and spoke to her paralegal, Mary Jane Weithe. Propounder told Ms. Weithe that he would be the sole beneficiary and executor. On 6 June 2007, propounder talked to Ms. Weithe about being named decedent's attorney-in-fact under a power of attorney and reiterated that he would be the sole recipient of all of decedent's personal property under the will.
On 7 June 2007, decedent was released from the hospital, and propounder called Ms. Weithe to schedule a meeting to discuss decedent's will. Decedent was readmitted to the hospital emergency room on 11 June 2007. During the admission process, propounder called Attorney Brooks' office and Ms. Wallace several times. At 9:00 a.m., propounder reached Ms. Weithe and arranged for her to meet with decedent. He also arranged for decedent to sign a power of attorney in his favor. At 11:00 a.m., decedent met with Ms. Weithe and discussed the terms of the will in propounder's presence. During the conversation, propounder interjected information several times. Ms. Weithe reviewed the power of attorney form *54 with decedent, and decedent signed the document making propounder her attorney-in-fact. Decedent told Ms. Weithe to prepare the will promptly. The next day, 12 June 2007, decedent executed another power of attorney because her name was misspelled in the prior draft and because Zubayda was named as a co-successor.
Following the meeting on 11 June 2007 between decedent and Ms. Weithe, propounder called Ms. Weithe and Ms. Wallace several times about the will. Attorney Brooks prepared the will. On 12 June 2007, propounder called Ms. Weithe twice to find out when the will would be executed. Propounder was present when the will was signed. Attorney Brooks did not personally meet with decedent; as a result, she received most of her information concerning decedent's health, mental capacity, and testamentary intent from Ms. Weithe. No attorney was present at the will's execution.
A "Do Not Resuscitate Order" was issued for decedent several hours after the will was signed. On the morning of 13 June 2007, decedent was discharged from the hospital in order to go home and die. After her discharge, propounder immediately began transferring money. On 14 June 2007, decedent's Wachovia IRA became fully funded. The following day, propounder transferred the Wachovia IRA funds to decedent's Wachovia checking account  an account which he solely would inherit under the will. Between 11 and 18 June 2007, propounder moved approximately $180,000 into decedent's checking account. On 21 June 2007, propounder transferred $44,000 from decedent's checking account to her money market account. On 22 June 2007, decedent died in propounder's home.
Propounder attempted to probate the will on 25 June 2007, but when Ms. Weithe informed propounder that the firm could not handle the matter until August 2007, propounder sought other counsel. On 28 June 2007, propounder proffered the will for probate in common form as the Last Will and Testament of decedent. The effect of the will was to leave $243,260.34 of probate assets solely to propounder. Decedent's non-probate assets, the Chase Bank and Genworth Life accounts, were to be divided into three equal shares between propounder, Ursula, and Zubayda. The will provided that the tangible personal assets, cash, and intangible assets held in the decedent's savings or checking accounts were to be distributed to propounder and the residuary estate to be divided in equal shares among propounder and his sisters. Due to propounder's actions between 13 and 22 June 2007, all probate assets of the estate at the time of decedent's death consisted of tangible personal assets, cash, and intangible assets held in decedent's savings or checking accounts, thereby leaving propounder's sisters with nothing under the will.
On 22 August 2007, caveator filed a caveat proceeding to contest the probate of the will on the grounds that decedent lacked sufficient mental capacity in that she could not: "(a) understand that she was making a will, (b) know what property she possessed, (c) understand the effect that the act of making a will would have on her property, (d) understand who would naturally be expected to receive her property upon her death, and/or (e) know to whom she intended to give her property." Caveator additionally alleged that the will was procured by undue influence.
Simultaneously with the filing of the caveat, caveator also filed a civil action challenging the decedent's ability to execute the beneficiary designations which disposed of the non-probate estate. This action was consolidated with the caveat proceeding; however, Caveator has not challenged the outcome of the corollary action on appeal.
The caveat proceeding was called for trial on 10 November 2008, and lasted for eight days. On 20 November 2008, the jury returned its verdict, and found that the will had been procured by undue influence. The jury also found that decedent had sufficient mental capacity to execute the will and the beneficiary designations for the non-probate accounts with Chase Bank and Genworth Life. As a result, propounder and his two sisters remained the beneficiaries in equal shares of the non-probate assets. On 21 November 2008, the trial court entered judgment setting aside the will and declaring that decedent *55 died intestate. Propounder filed notice of appeal from the judgment on 8 December 2008.
Caveator filed a motion for attorneys' fees and costs pursuant to N.C. Gen.Stat. § 6-21(2) (2009) in the amount of $68,678.09 on 21 November 2008. On 24 November 2008, caveator filed a motion to have funds returned to the estate from propounder, including $40,000 in costs and attorneys' fees expended by propounder without a court order. On 9 December 2008, propounder filed his own motion for attorneys' fees and costs to be taxed to the estate in the amount of $144,809.71. After a hearing, the trial court granted caveator's motion for attorneys' fees and costs, and deferred its decision on propounder's motion pending the outcome of this appeal. Propounder filed a second notice of appeal from the trial court's order as to fees and costs on 16 December 2008.
On appeal, propounder presents three issues: (1) whether the trial court erred in excluding from evidence certain oral communications between propounder and decedent, (2) whether the trial court erred in instructing the jury that a fiduciary relationship existed between propounder and decedent, and (3) whether the trial court had jurisdiction to enter the order awarding caveator's attorneys' fees and costs after notice of appeal was taken from the judgment.

II. JURISDICTION AND STANDARD OF REVIEW
The judgment entered herein is a final judgment from which appeal lies to this court pursuant to N.C. Gen.Stat. § 7A-27(b) (2009).
A. There is confusion in the law as to the standard of review of a decision regarding N.C. Gen.Stat. § 8C-1, Rule 601(c) (2009). Rule 601 generally governs the competency of witnesses, and determinations based thereupon are reviewed for abuse of discretion. See State v. Liner, 98 N.C.App. 600, 606, 391 S.E.2d 820, 823 (1990). However, the function of Rule 601(c) is to exclude proffered testimony when it is shown "`(1) that such witness is a party, or interested in the event, (2) that his testimony relates to a personal transaction or communication with the deceased person, (3) that the action is against the personal representative of the deceased or a person deriving title or interest from, through or under the deceased, and (4) that the witness is testifying in his own behalf or interest[,]'" In re Will of Lamparter, 348 N.C. 45, 51, 497 S.E.2d 692, 695 (1998) (quoting Godwin v. Wachovia Bank & Trust Co., 259 N.C. 520, 528, 131 S.E.2d 456, 462 (1963)), and when none of the circumstances which result in a waiver of the prohibition set out in Rule 601(c) exist. In order to make this determination, the trial court, in the first instance, and this Court, on appellate review, are required to determine the manner in which a number of legal principles should be applied. Unlike the situation with respect to N.C. Gen.Stat. § 8C-1, Rule 403 (2009) or with respect to Rule 601(a) or (b), nothing in the language of Rule 601(c) suggests that the implementation of the Dead Man's Statute involves the making of a discretionary determination, although the fact that its application may, under some circumstances, involve what amounts to a relevance determination does suggest that a degree of deference should be given to the trial court's decision. In similar circumstances, our Court has declined to utilize an abuse of discretion standard of review. State v. Wallace, 104 N.C.App. 498, 410 S.E.2d 226 (1991) (stating that Rule 401 "sets a standard to which trial judges must adhere in determining whether proffered evidence is relevant," although "this standard gives the judge great freedom to admit evidence because the rule makes evidence relevant if it has any logical tendency to prove any fact that is of consequence"; for that reason, "even though a trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to [N.C. Gen.Stat. § 8C-1,] Rule 403, such rulings are given great deference on appeal"). Id. at 502, 410 S.E.2d at 228. As a result, the standard of review for use in this case is one that involves a de novo examination of the trial court's ruling, with considerable deference to be given to the decision made by the trial court in light of the relevance-based inquiries that are inherent in the resolution of certain issues involving *56 application of Rule 601(c), including the provisions which result in "opening the door" to the admission of otherwise prohibited testimony.
B. In reviewing jury instructions, this Court must review and consider jury instructions "in their entirety." Arndt v. First Union Nat'l Bank, 170 N.C.App. 518, 525, 613 S.E.2d 274, 279 (2005). The "appealing party must show not only that error occurred in the jury instructions but also that such error was likely, in light of the entire charge, to mislead the jury." Estate of Hendrickson v. Genesis Health Venture, Inc., 151 N.C.App. 139, 151, 565 S.E.2d 254, 262 (2002). The trial court is "`required to instruct a jury on the law arising from the evidence presented.'" Arndt, 170 N.C.App. at 525, 613 S.E.2d at 279 (citation omitted); see N.C. Gen.Stat. § 1A-1, Rule 51 (2009).
C. With regard to the jurisdiction of the trial court to enter orders after notice of appeal has been given, we review the record under a de novo standard of review. Moody v. Sears Roebuck & Co., 191 N.C.App. 256, 264, 664 S.E.2d 569, 575 (2008) ("Whether a trial court had jurisdiction to enter an order is a question of law that we review de novo."). Pursuant to the de novo standard of review, "the court considers the matter anew and freely substitutes its own judgment for that of the [trial court]." In re Appeal of the Greens of Pine Glen Ltd. P'ship, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003).

III. ANALYSIS

A. Waiver of the Dead Man's Statute
Propounder contends that the trial court's exclusion of oral communications between himself and decedent "irreparably damaged" his case, because he was unable to explain to the jury that his actions were taken in direct response to the requests of decedent. We disagree.
The Dead Man's Statute, formerly N.C. Gen.Stat. § 8-51, is now codified as Rule of Evidence 601(c). See N.C. Gen.Stat. § 8C-1, Rule 601(c). On the basis of competency, Rule 601(c) serves to disqualify the testimony of certain witnesses:
(c) Disqualification of interested persons.  Upon the trial of an action, . . . a party or a person interested in the event. . . shall not be examined as a witness in his own behalf or interest, or in behalf of the party succeeding to his title or interest, against the executor, administrator or survivor of a deceased person, or the committee of a lunatic, or a person deriving his title or interest from, through or under a deceased person or lunatic, by assignment or otherwise, concerning any oral communication between the witness and the deceased person or lunatic. However, this subdivision shall not apply when:
(1) The executor, administrator, survivor, committee or person so deriving title or interest is examined in his own behalf regarding the subject matter of the oral communication.
(2) The testimony of the lunatic or deceased person is given in evidence concerning the same transaction or communication.
(3) Evidence of the subject matter of the oral communication is offered by the executor, administrator, survivor, committee or person so deriving title or interest.
N.C. Gen.Stat. § 8C-1, Rule 601(c)(1)-(3). Rule 601(c) excludes a witness' testimony when it is shown "`(1) that such witness is a party, or interested in the event, (2) that his testimony relates to a personal transaction or communication with the deceased person, (3) that the action is against the personal representative of the deceased or a person deriving title or interest from, through or under the deceased, and (4) that the witness is testifying in his own behalf or interest.'" In re Will of Lamparter, 348 N.C. at 51, 497 S.E.2d at 695 (citation omitted).
In this case, propounder does not take issue with the fact that his excluded testimony was covered by the Dead Man's Statute. Instead, he contends that the protection of the Dead Man's Statute was waived by caveator when caveator was either examined about or offered evidence concerning the subject matter of the conversations with the decedent. Citing Carswell v. Greene, 253 N.C. 266, 116 S.E.2d 801 (1960) and Breedlove *57 v. Aerotrim, U.S.A., Inc., 142 N.C.App. 447, 543 S.E.2d 213 (2001), propounder's position is that the excluded testimony should have been admitted because caveator "opened the door." Propounder challenges the exclusion of evidence concerning two conversations with decedent.
First, propounder addresses the exclusion of evidence of a conversation between decedent and caveator. At trial, caveator testified concerning the events of the night of 13 May 2007 and the afternoon of 14 May 2007. During this time frame, caveator testified that decedent, his mother, who was ill with advanced cancer, became angry at him when he asked her to eat some lamb broth and other food he had prepared for her. Subsequently, caveator testified that he went to get candy for his mother, and when he returned, she was missing. A search ensued, during which the mother was located at a neighbor's house. The next morning, she asked him to leave her apartment.
A review of the testimony illustrates that caveator's lawyer asked a series of questions concerning these events which were worded in a manner that would not require caveator to repeat oral communications between himself and decedent. Nevertheless, during caveator's answers at trial, caveator mentioned several things that decedent said to him:
Q: Ms. Gregory referred to an argument. Was there any sort of argument that night?
A: At the table. Over eating. Pushing her to eat and her getting acrimonious. And I said, "You're not going to get well if you don't eat." And that's the wrong thing to say to my Mother. That's talking negative and she didn't like to be talked negative to. She said, I'll get well. I don't have to." . . .
. . .
Q: All right. Did your mother make it clear to you that morning that she wanted you to leave?
A: Yes. She did. She made it very clear that I had to leave.
At trial, propounder attempted to present his version of these events occurring between decedent and caveator. During a voir dire examination outside the presence of the jury, propounder described his first meeting with decedent after caveator had left her apartment:
Q: How long was it before you got into the apartment that [decedent] made mention of [caveator]?
A. In a few more minutes, maybe five.
Q. Did she make any explanation to you of why he wasn't there?
A. Yes.
Q. What did she tell you?
Mr. Mahoney: That's objectionable, Judge.
Mr. McPherson: Go forward.
The Witness: She said that she kicked him out, got the keys away from him. . . .
Q. Did she offer any reason why she kicked him out?
Mr. Mahoney: Objection.
A. Yes, she said that he became violent.
Q. Did she amplify on that?
A. Yes.
Q. What else did she say.
A. She said he started throwing dishes, breaking them, and kicking the furniture and she said he used the F word. I said, how. She said that he yelled at me and I was afraid of him. He said, can't you understand you're dying, you stupid, old, f_ _ _ _ woman.
Propounder next challenges the trial court's decision to exclude his testimony concerning a conversation that he allegedly had with decedent in which she requested that he travel to New York to see her immediately. Had propounder been permitted to testify concerning the second of these two conversations, he would have stated that:
Well, how did it start? She said, "Can you come?" No, no. I said, "I want to come see you before things go bad." Next thing she said, "When can you come?" Without waiting for an answer, she said, "Can you come today?" And I said, "No, I don't know if there is any flights from Albuquerque today, but I'll let you know when I can come after I talk to the airlines."
*58 Propounder summarized this second conversation with decedent by saying that "[s]he wanted me to go there today, and I couldn't."
After a lengthy discussion with counsel, the trial court sustained caveator's objections to the above testimony. In addition, the trial court examined the prior depositions taken by caveator. The trial court's reasoning concerning the issue of whether the protection of the Dead Man's Statute had been waived is summarized in the following ruling:
I looked at each of the portions of the transcript of [propounder's] deposition that you've described and I've tried to read enough of it . . . to understand the full context of the question. On each of these occasions when Mr. Mahoney asked, did they have a conversation, he doesn't follow with, what was that conversation. I think in order for there to be a waiver, he would have had to attempt to elicit the conversations with a question like that[.]
I do believe he would have had to ask, what was that conversation or what did she say. He doesn't do that on any of these occasions that you cite.
The court's ruling highlights the problematic nature of the post-1983 revision of the Dead Man's Statute. Under the pre-1983 formulation, the Dead Man's Statute prohibited testimony about both conversations and transactions. The current formulation prohibits only oral communications. N.C.R. Evid. 601 commentary ("The Dead Man's Statute will now be applicable only to oral communications[.]"). This proscription as to oral communications contrasts starkly with the waiver rules in subsections (1) and (3) of Rule 601(c), which require an examination of the broader category of "subject matter of the oral communication" to determine whether the door has been "opened." N.C.R. Evid. 601(c)(1), (3). The commentary to Rule 601 advises further that "[i]t was not the intent of the drafters of subdivision (c) to change any existing cases where the Dead Man's Statute has been held to be inapplicable, or where, because of the actions of one party or the other the protection of the rule has been held to be waived." N.C.R. Evid. 601 commentary. Under former section 8-51, one party could open the door to the presentation of evidence concerning the oral communications of a decedent for an adverse party if the waiving party put on evidence concerning a mere transaction. See, e.g., Hayes v. Ricard, 244 N.C. 313, 93 S.E.2d 540 (1956) (documents proffered by plaintiffs concerning title to real property in issue via decedent's attorney held to "open the door" to rebuttal evidence from defendant, including testimony of conversations between decedent's attorney and decedent and events surrounding some documents offered by plaintiffs). Therefore, it appears that the restriction of Rule 601(c) to oral communications, the seemingly easy means by which the Dead Man's Statute may be waived by inquiring merely into "subject matter" rather than oral communications, and the explicit saving of our old case law under former section 8-51 make the issue of waiver under the Dead Man's Statute very murky water.[3]
The mandates of Rule 601(c) and our prior case law on the issue of whether an interested party has "opened the door" and waived the protection of the Dead Man's Statute, has led to the rule that: if the question propounded by counsel to his own witness or an adverse witness specifically requires the witness to repeat oral communications with the deceased, then there has been a waiver under Rule 601(c)(1) or (3) by the party propounding the question. If, on the other hand, the question propounded by counsel to his own witness does not specifically require the witness to repeat oral communications with the deceased, and the answer given by his own witness provides an oral communication with the deceased, then there has also been a waiver under Rule 601(c)(1) or (3) by the answering party.
In this case, the trial court did not apply this rationale to the evidence before it, and if it had, the record shows that caveator's remarks concerning the oral communications with decedent, though unsolicited by *59 his counsel, should have resulted in a waiver of the protection of the Dead Man's Statute to the extent of the subject matter testified to by caveator. Godwin v. Tew, 38 N.C.App. 686, 688, 248 S.E.2d 771, 773 (1978) ("When the door is thus opened for the adverse party, it is only opened to the extent that he may testify as to the transaction about which he was cross-examined."). Likewise, caveator waived his Rule 601(c) objection to propounder's testimony concerning the reasons for his visit to New York because caveator's attorney questioned propounder thereupon during propounder's deposition. Reviewing the trial court's ruling de novo, we therefore find that the trial court erred by failing to find waiver had occurred under Rule 601(c) and thereafter excluding the proffered evidence. However, given the requirement that prejudice be shown as a precondition for an award of appellate relief, we will further examine whether or not the exclusion of propounder's rebuttal evidence "irreparably harmed" or was prejudicial to propounder's case on the jury question of undue influence.
Undue influence "is exerted by various means of a kind that so overpowers and subjugates the mind of the testator as to destroy his free agency, and to make him execute a will, which, although his, in outward form, is in reality not his will, but the will of another person, which is substituted for that of the testator." In re Will of Thompson, 248 N.C. 588, 593, 104 S.E.2d 280, 284 (1958).
Undue influence is frequently employed surreptitiously, and is chiefly shown by its results. When the issue of undue influence is raised, the question presented is usually one of the effect of a long course of conduct upon the mind of the testator at the time the will is made, and the evidence by which it is established is usually circumstantial.
Id. "`There are four general elements of undue influence: (1) a person who is subject to influence; (2) an opportunity to exert influence; (3) a disposition to exert influence; and (4) a result indicating undue influence.'" In re Will of Dunn, 129 N.C.App. 321, 328, 500 S.E.2d 99, 104 (1998) (quoting Griffin v. Baucom, 74 N.C.App. 282, 286, 328 S.E.2d 38, 41 (1985)).
Our readings of the transcript, which contained the evidence which would have been introduced but for the trial court's ruling, does not persuade us that the admission of the challenged testimony would have resulted in a different decision by the jury. Propounder's argument  that a full explanation of the altercation taking place on 13 and 14 May 2007 would have shed a different light on the events taking place between 23 May 2007 to 12 June 2007  is not well founded in light of the weight of the other evidence adduced at trial by caveator.
At the time of the execution of the will, decedent was of advanced age, seventy-six years old, and suffering in Duke University Hospital from terminal uterine sarcoma. According to her medical records, the cancer had metastasized into her lungs and liver; and at the time the will was signed, decedent appeared sickly, feeble, and in poor physical condition. During this time, decedent was also dependent upon propounder to sign medical releases at the hospital. Caveator testified that his phone calls to speak to his mother went unreturned. The attorney who drafted the will was procured by propounder, and propounder was present during the interview with the paralegal who prepared the will. Propounder made transfers of sums of cash from his aunt's accounts prior to her death, which had the effect of maximizing his post-death inheritance to the exclusion of his sisters when decedent had specifically included the sisters in beneficiary designations. There was extensive evidence demonstrating propounder's impatience in connection with the execution of the will and the power of attorney, and the rapid pace that propounder moved money and accounts as soon as he had the ability to do so. These events occurred within the immediate time frame of the execution of the will, and specifically concern indicia our appellate courts have held to be highly probative on the issue of undue influence. In re Will of Sechrest, 140 N.C.App. 464, 469, 537 S.E.2d 511, 515 (2000); see N.C.P.I., Civ. 860.20 (gen.civ.vol.2006).
The excluded evidence tended to show that decedent became very angry at caveator on *60 the evening of 13 May 2007 because he treated her badly and that propounder came to New York following that incident at decedent's request. Despite the trial court's decision to exclude evidence of propounder's testimony concerning decedent's version of the events that occurred between caveator and decedent on the evening of 13 May 2007, the jury heard other evidence that caveator threw and broke a dish on that occasion, that he acted aggressively toward decedent, that his conduct angered and frightened her, and that she expelled him from her apartment. Similarly, despite the trial court's decision to exclude propounder's version of his conversation with decedent about coming to and the timing of his trip to New York, the record contains ample evidence that decedent had a falling-out with caveator and that propounder took many other actions at decedent's request.
The evidence excluded by the trial court and sought to be admitted by propounder is tangential, at best, on the issue of the undue influence. In an undue influence case, the issue is not how severely the decedent was estranged from her next-of-kin, but to what extent the person asserting the influence had on the execution of a will on the decedent. On balance, we are not convinced that the evidence omitted would have persuaded the jury on the issue of undue influence.
Since the evidence sought to be admitted by propounder would not have swayed the jury's decision on undue influence, it was not prejudicial error by the trial court to exclude the evidence. The trial court's error does not justify an award of appellate relief in that the jury heard the same or similar evidence during the course of the trial. State v. Richardson, 341 N.C. 658, 671, 462 S.E.2d 492, 501 (1995) (holding that any error in the exclusion of certain evidence "was harmless because defendant elicited substantially the same evidence through other witnesses"). In addition, given the fact that an undue influence claim is necessarily focused on the events that surrounded the execution of the disputed will and the fact that the evidence that propounder came to New York at decedent's request regarding an event that occurred over a month prior to the execution of the disputed will, evidence concerning the reason for the timing of propounder's trip to New York would not have had any significant impact on the jury's verdict with respect to the undue influence issue. As a result, the erroneous exclusion of the evidence concerning decedent's statements to propounder about the events that occurred on the evening of 13 May 2007 and the reason for the timing of propounder's trip to New York was, under the facts of this case, harmless error.

B. Fiduciary Duty Jury Instruction
Propounder argues that the jury instruction given by the trial court regarding a fiduciary relationship erroneously established the legal presumption of undue influence, and unfairly shifted the burden of proof. We disagree.
The instruction challenged by propounder reads, in part, as follows:
In addition, Caveator has offered evidence that a fiduciary relationship existed between the Deceased and [propounder] when Propounder[']s Exhibit 1 was executed. Caveator has the burden to prove by the greater weight of the evidence that a fiduciary relationship, in fact, existed. A fiduciary is a person in whom another person has placed special faith, confidence and trust. Because of the trust and confidence placed in him by another person, a fiduciary is required to act honestly, in good faith and in the best interest of that person.
A fiduciary relationship may exist in a variety of circumstances. Anytime one person places special faith, confidence and trust in another person to represent his best interest, a fiduciary relationship exists. It is not necessary that it be a technical or legal relationship. By law a fiduciary relationship exists between principals and their agents under a power of attorney. If you find by the greater weight of the evidence that a fiduciary relationship existed between the Deceased and [propounder] when Propounder[']s Exhibit 1 was executed, then the law presumes that the will was produced by undue influence  excuse me, procured by undue influence.
If you find the existence of a fiduciary relationship, the Propounders may rebut *61 the presumption by proving with evidence of equal weight that Propounder[']s Exhibit 1 was the free and voluntary act of the Deceased. In any event, the burden remains upon Caveator to prove, by the greater weight of the evidence, that the execution of Propounder[']s Exhibit 1 was procured by undue influence. Finally, as to this issue on which the Caveator has the burden of proof.
If you find, by the greater weight of the evidence, that the execution of Propounder[']s Exhibit 1 was procured by undue influence, then it would be your duty to answer this issue yes, in favor of the Caveator. If, on the other hand, you fail to so find, then it would be your duty to answer this issue no, in favor of the Propounders.
The evidence adduced at trial clearly shows that decedent and propounder had developed a close, trusting relationship. The issue the trial court faced was whether or not this relationship had been sufficiently formalized to shift the burden of proof to propounder to show that he did not take advantage of this relationship. Propounder did not request an instruction at the jury instruction conference on this countervailing issue. Furthermore, our review of the record shows that propounder did not offer any rebuttal evidence showing that he took no advantage of his position. Clearly, the excluded evidence discussed supra does not rebut caveator's showing, because it contains no discussion of the disposition of decedent's estate resulting from acts taking place after decedent left New York.
The evidence at trial was conflicting as to when and whether propounder and decedent had, in fact, established a principal-agent relationship by the execution of a power of attorney. The above instruction shows that the trial court, in an effort to properly instruct the jury and to provide for the shifting burden, did not conclusively instruct the jury that a fiduciary relationship did, in fact, exist. Rather, the trial court instructed the jury as to the legal consequences of a principal-agent relationship, if one existed, and then treated the issue as a factual matter for jury resolution. If the trial court had intended to inform the jury that a fiduciary relationship existed, as a matter of law, the pattern jury instruction provides the following: "In this case, members of the jury, [Propounder and the Decedent] had a relationship of [agent and principal]. You are instructed that, under such circumstances, a relationship of trust and confidence existed." N.C.P.I., Civ. 501.55 (gen.civ.vol.2003). The trial court here did not use this instruction, and instead left open the question of whether a fiduciary relationship existed, placing the burden squarely on caveator to prove its existence. The modified instruction did not usurp the jury's duty to weigh the evidence of a fiduciary duty and did not incorporate a mandatory presumption. The jury made its own determination as to whether or not a fiduciary relationship existed based on all evidence it had heard.
Propounder's reliance on In re Estate of Ferguson, 135 N.C.App. 102, 518 S.E.2d 796 (1999), is misplaced. In Ferguson, we held that the trial court did not err by declining to give the jury an instruction on the effect of the existence of a fiduciary relationship because the record showed that, while a power of attorney was executed at the same time as the will in issue, the power of attorney was not delivered to the propounder until eighteen months after its execution. Id. at 105, 518 S.E.2d at 798. Since the fiduciary relationship alleged by the caveator was based solely on the belated power of attorney, we held that the omission of a fiduciary relationship jury instruction was not error. Id. at 105, 518 S.E.2d at 799.
In this case, the will and power of attorney were not signed simultaneously, and the evidence was sufficient to permit a reasonable person to conclude that propounder began acting as decedent's agent in advance of the execution of the written power of attorney in both financial and health-related matters. Propounder was present for critical estate planning decisions, and orchestrated the procurement of the will and the power of attorney. Immediately after the execution of the power of attorney, which occurred one day before the will was executed, propounder began acting based on its authority.
The facts of this case clearly support the trial court's instruction. The instruction correctly *62 placed the burden on caveator, and the jury agreed that caveator had met his burden of proof. Because the trial court's instruction correctly stated the law and did not mislead the jury, it was properly given. This assignment of error is overruled.

C. Attorneys' Fees and Costs
Propounder lastly claims that the trial court erred in entering its order awarding caveator's attorneys' fees and costs, because (1) the trial court lacked jurisdiction under N.C. Gen.Stat. § 1-294 (2009) and (2) a reversal of this case on appeal in this Court would show that caveator's proceeding lacked substantial merit. We disagree.
As to the first argument, this Court has already held that a trial court may enter an award of attorneys' fees following notice of appeal from a prior judgment in a caveat proceeding, section 1-294 notwithstanding. In re Will of Dunn, 129 N.C.App. 321, 329-30, 500 S.E.2d 99, 104-05 (1998) ("The trial court's decision to award costs and attorneys' fees was not affected by the outcome of the judgment from which caveator appealed; therefore, the trial court could properly proceed to rule upon the petitions for costs and attorneys' fees after notice of appeal had been filed and served."); cf. McClure v. County of Jackson, 185 N.C.App. 462, 470, 648 S.E.2d 546, 551 (2007) (holding that Dunn is limited to caveat proceedings). Regarding propounder's second argument, we have already held that there was no prejudicial error in the judgment. This assignment of error is overruled.

IV. CONCLUSION
For the reasons set forth above, we find
No prejudicial error.
Judges MCGEE and ERVIN concur.
NOTES
[1] Propounder's sisters, Ursula and Zubayda Renate Abayhan, were also propounders at trial, but are not parties to this appeal. Accordingly, we will refer to propounder herein in the singular.
[2] The net value of the two Chase brokerage accounts and the Genworth Life annuity was $307,424.51.
[3] For further commentary on this subject see Kenneth S. Broun, Brandis and Broun on North Carolina Evidence § 145 (6th ed.2004).